# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### COLUMBIA DIVISION

JESSIE L. FORIEST             )
                                  )
        **Plaintiff,**        )
                                  )     **Civil Action No. 1:05-0056**
      **v.**                 )     **Judge Nixon / Knowles**
                                  )
**JO ANNE BARNHART,**       )
**Commissioner of Social Security**   )
                                  )
        **Defendant.**      )

## REPORT AND RECOMMENDATION

This is a civil action filed pursuant to 42 U.S.C. § 405(g), to obtain judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Supplemental Security Insurance ("SSI") benefits, as provided under Title XVI of the Social Security Act ("the Act"), as amended. The case is currently pending on Plaintiff's Motion for Judgment on the Administrative Record. Docket Entry No. 18-1. Defendant has filed a Response, arguing that the decision of the Commissioner was supported by substantial evidence and should be affirmed. Docket Entry No. 22.

For the reasons stated below, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

## I.  INTRODUCTION

Plaintiff filed his application for Supplemental Security Income ("SSI") benefits on January 29, 1992, alleging that he had been disabled since February 18, 1993, due to back pain

1

and generalized anxiety disorder.  *See, e.g.,* Docket Entry No. 18-2, Attachment ("TR"), pp. 44.

Plaintiff received benefits until June 22, 2001, when the Social Security Administration found

that Plaintiff's health had improved and he was no longer eligible for benefits.  TR 62.  Plaintiff

filed a request for reconsideration on July 5, 2001. TR 65.   Plaintiff subsequently requested (TR

81-82) and received (TR 19-25) a hearing.  Plaintiff's hearing was conducted on October 23,

2003, by Administrative Law Judge ("ALJ") Ronald E. Miller.  TR 521-550.  Plaintiff and

Vocational Expert, Dr. Gordon H. Doss, appeared and testified. TR 521-522.

On February 18, 2004, the ALJ issued a decision unfavorable to Plaintiff, finding that

Plaintiff was not disabled within the meaning of the Social Security Act and Regulations.  TR

25.  Specifically, the ALJ made the following findings of fact:

> 1. The claimant has not engaged in substantial gainful activity since June 1, 2001, the date of a prior finding of disability cessation.
>
> 2. The claimant has "severe" impairments including a back disorder, loss of vision in the left eye and an anxiety disorder with dysthymia.
>
> 3. The claimant's impairments, considered individually and in combination, have not met or equaled in severity any impairment set forth at 20 CFR Part 404, Subpart P, Appendix One since June 1, 2001.
>
> 4. The claimant's subjective allegations of a continuation of disabling pain and functional limitations since June 1, 2001, are not credible.
>
> 5. The claimant retains the residual functional capacity to lift and carry 20 pounds occasionally and 10 pounds frequently, with capacity to stand/walk or sit for six out of eight hours, with visual limits precluding work requiring depth perception, strong acuity or farsightedness, and as further compromised by moderate mental functional limitations in the abilities to carry out detailed instructions, maintain attention/concentration for extended periods,

2

work with others without being distracted by them, complete a
normal workday/workweek and maintain a consistent pace without
psychologically based symptoms or unreasonable breaks, interact
appropriately with the general public and respond approrpriately to
changes in the work setting.

6. The claimant cannot perform any past relevant work.

7. The claimant is an individual of approaching advanced age.

8. The claimant has a limited education.

9. The claimant has no transferable work skills.

10. If the claimant could perform the full range of light work,
considering age, education and work experience, a directed
conclusion of "not disabled" would result under Rule 202.10 of
Appendix Two to Subpart P, 20 CFR Part 404.

11. Although the claimant's additional nonexertional limitations do
not allow performance of the full range of light work, using the
above-cited Rule as a framework for decision making, jobs exist in
significant numbers in the national economy that could be
performed. Examples of such jobs include: presser; domestic
housekeeper; cleaner; and companion/sitter.

12. Medical improvement related to the ability to work occurred
by June 1, 2001.

13. The claimant has not been under a disability, as defined under
the Social Security Act, at any time since June 1, 2001.

TR 24-25.

On March 24, 2004, Plaintiff timely filed a request for review of the hearing decision.

TR 14-15. On March 3, 2005, the Appeals Council issued a letter declining to review the case,

thereby rendering the decision of the ALJ the final decision of the Commissioner. TR 10. This

civil action was thereafter timely filed, and the Court has jurisdiction. 42 U.S.C. § 405(g). If the

Commissioner's findings are supported by substantial evidence, based upon the record as a

whole, then these findings are conclusive. *Id.*

3

## II.  REVIEW OF THE RECORD

### A.  Medical Evidence

Plaintiff alleges disability due to constant and severe low back pain, anxiety, and depression.  TR 20.

On January 16, 2000, Plaintiff was treated at Saint Thomas Hospital by Dr. Douglas Pasto-Crosby for cough, body aches, and malaise.  TR 311-324.  Dr. Pasto-Crosby found that these symptoms were "most consistent with the flu" and started Plaintiff on "Mepergan Fortis 1-2 q4h as needed for aches and pains." TR 312.

On May 14, 2000, Plaintiff was treated by Dr. Mark Marsden at Saint Thomas Hospital for right flank pain. TR 304.  Dr. Marsden's impression was that Plaintiff had "right flank pain, probably musculoskeletal in origin." *Id.* Plaintiff was given a prescription for Lortab and scheduled an appointment with his primary care physician, Dr. Jay Anderson. *Id.*

On May 30, 2000, Plaintiff visited the Saint Thomas Hospital emergency room with "episodic right flank pain of several years duration." TR 295-296. Plaintiff was treated by Dr. George J. Cooper who was "reluctant to prescribe narcotics for pain that has been present off and on for several years, in which he seems to have made no attempt to obtain a formal evaluation by his primary care physician." TR 296.   Dr. Cooper recommended that Plaintiff take Ibuprofen for pain. *Id.*

On June 5, 2000, Plaintiff visited Saint Thomas Hospital emergency room complaining that "[he] got rolled over by a power wagon and thrown down an embankment yesterday. [He] can't breathe and it hurts to walk." TR 285-293. He was treated in part by Dr. Paul M. Bergeron who found that he had "Normal right rib cage films" and a "Normal left knee." TR 292-293.

On June 7, 2000, Plaintiff again visited the Saint Thomas Hospital emergency room for

4

injuries sustained from the power wagon accident.  TR 283-284.  Dr. Pasto-Crosby found

"contusions to the right chest and left knee" and prescribed Ultran for pain. TR 284.

On July 3, 2000, Plaintiff was admitted to Saint Thomas Hospital where he was treated

by Dr. David Schull for abdominal pain.  TR 204. A CT scan revealed a "5 cm solid right renal

mass" (TR 204, 278) and Plaintiff was diagnosed with "malignant neoplasm of kidney, except

pelvis" (TR 281). The Plaintiff underwent a "right radical nephrectomy without complication."

TR 204. There was no evidence of a hernia, and no repair work was done.[1]  *Id.*

Plaintiff was admitted to the Baptist Hospital emergency room on July 11, 2000 with

complaints of back and flank pain.  TR 219. Dr. Charles E. Fredericks noted that Plaintiff

allegedly  fell from a motorized chair leaving abrasions on his knees and right arm.  *Id.*  Plaintiff

reported that the pain was present before the fall.  *Id.*  Dr. Fredericks found the pain to be related

to the recent surgery, and an abnormal urinalysis which he planned to discuss with Dr. Schull.

TR 220.  Also on July 11, 2000, Dr. Gregory R. Weaver conducted an exam of the "abdomen flat

and upright with PA chest" on Plaintiff, finding that there is "free air below both

hemidiaphragms right greater than left." TR 227. Dr. Weaver also found post operative changes

and "opacities in the left base suggesting subsegmental atelectasis."  *Id.*

On July 16, 2000, Dr. David N. Bolus conducted an exam of Plaintiff's "flat and erect

abdomen." TR 226. Dr. Bolus found no evidence of "acute intra-abdominal abnormality." *Id.*

On August 7, 2000, Plaintiff went to the Saint Thomas Hospital emergency room with

complaints of abdominal pain and "something popp[ing]."  TR 271-272.  Plaintiff also

complained of testicular pain.  *Id.*  He was treated by Dr. Mark Marsden, who refused to give

---

[1] A report of this operation in which Dr. Schull detailed the procedure can be found at TR 278-279.

Plaintiff the requested narcotics, after which Plaintiff left "without any further treatment or signing forms." TR 275. Dr. Marsden recommended that Plaintiff follow up with his primary care physician. TR 271.

On August 10, 2000, Dr. S. Ben Rutledge conducted an exam of Plaintiff's abdomen. TR 225. Dr. Rutledge identified "no free air," but he did identify "postsurgical changes," "scattered gas in segments of the intestinal tract," "some air fluid levels in the right mid-abdomen," and a "nonspecific" abdominal "gas pattern." *Id.*

On September 3, 2000, Dr. James R. Anderson treated Plaintiff for back and leg pain on the right side. TR 240. Dr. Anderson found that Plaintiff had a "UTI/Prostate" for which he prescribed medications, including "Tordal," and recommended an appointment with a urologist.[2] *Id.* Dr. Anderson also conducted an "EDP History & Physical Worksheet." TR 242. Dr. Anderson noted that Plaintiff's primary complaints were of back pain on his right side and depression. *Id.* Various laboratory tests were also taken at Columbia Cheatham Medical Center. TR 243. Dr. Anderson noted in particular that the "UA Blood" was "small," the "UA WBC" was greater than 100, the "UA Bacteria" was moderate, the "UA Appearance" was cloudy, and the "UA Esterase" was "positive." *Id.*

On September 7, 2000, Dr. Jeffrey Lundy treated Plaintiff for back pain. TR 235. The nurse noted that Plaintiff felt pain higher on the back and that it was "different" from his usual back pain. *Id.* The primary diagnosis was musculoskeletal pain for which Dr. Lundy prescribed Kenalog, Decadron, and Percodan. TR 235.[3]

---

[2] Dr. Anderson prescribed another medication, the name of which is illegible. TR 240.

[3] Dr. Lundy prescribed other medications, the names of which are illegible. TR 235.

6

On September 23, 2000, Plaintiff visited the Saint Thomas Hospital emergency room for lacerations sustained on his right hand "while working on a car." TR 267. Plaintiff was first treated by Dr. K.M. Raja who then referred the patient to Dr. Coogan to have the wound repaired. *Id.*

On September 28, 2000, Plaintiff was treated at Baptist Hospital by Dr. James L. Davison for "severe pain" in his right hand following surgery and "severe pain in the right flank area where he had a nephrectomy." TR 208. Dr. Davison found that there were "few physical findings to suggest an explanation for patient's pain." TR 209. He prescribed 10 Percocet and gave the Plaintiff an injection of Toradol. *Id.*

Also on September 28, 2000, Plaintiff went to Saint Thomas Hospital emergency room with complaints of right-sided abdominal pain. TR 259. Dr. Marsden treated Plaintiff and asked to perform blood work and a urinalysis. *Id.* Plaintiff requested specific pain medications but Dr. Marsden refused those until the evaluation was completed. *Id.* Plaintiff left before the evaluation was completed and blood could be drawn. *Id.*

Plaintiff was admitted to Cheatham Medical Center emergency room on October 6, 2000 with post-surgical flank pain. TR 231. Again, Dr. Lundy treated Plaintiff and prescribed Tylox for the pain. *Id.*

On October 16, 2000, Plaintiff was admitted to the Saint Thomas Hospital emergency room for an "itching reaction to codeine." TR 253. Dr. Pasto-Crosby treated Plaintiff with Solu-Medrol IV, Benadryl and morphine. *Id.* Plaintiff's itching initially got better but soon worsened and he was given Pepcid IV, more morphine, and 2 Percocet to take home "for pain during the night." *Id.* Plaintiff was advised to avoid codeine in the future. *Id.*

On October 24, 2000, at Centennial Medical Center, Dr. Knoll performed a CT scan with

7

"contrast" of both the abdomen and pelvis of Plaintiff. TR 244.  Dr. Knoll found that "contrast

extravasation at approximately 100 cc left antecubital fossa which will be followed

radiographically and clinically." *Id.*

On February 19, 2001, Plaintiff was treated at Saint Thomas for lower back and right

flank pain. TR 246-251. He was treated by Dr. Marsden who recommended that Plaintiff get

imaging studies and x-rays.  TR 247.  Plaintiff refused to get x-rays, imaging studies, or blood

work and requested only narcotic pain medications. *Id.* Dr. Marsden gave Plaintiff non-narcotic

pain medication and planned a follow up with Dr. Shull and Dr. Abramson. *Id.*

On May 1, 2001, Dr. Venkat Reddy noted that Plaintiff's back ache was better with

medicine. TR 402.  Dr. Reddy diagnosed Plaintiff with a back ache and prescribed Hydrocodone

and Tagament.[4] *Id.*

A psychological evaluation was conducted on Plaintiff by Dr. James Proffitt on May 9,

2001.  TR 325-326.  Dr. Proffitt determined the following:

> Axis I: Panic Disorder with agoraphobia and dysthymia. Axis II: none. Axis III:
> Deferred. Axis IV: Poor health, unemployment, legal history and facing eviction.
> Axis V: Current GAF: 55. Highest GAF in past year is 65.

TR 327.  Plaintiff's IQ was found to be 77, which is considered borderline to low-average. TR

328.  Dr. Proffitt noted that Plaintiff felt his "anxiety is worse than depression." TR 326.  Dr.

Proffitt also found that Plaintiff's "[d]ecision making was paralyzed and social maturity was

self-centered."  TR 327.

On May 10, 2001, Dr. Grafton H. Thurman performed a consultative examination on

Plaintiff.  TR 330-336.  Dr. Thurman's impression was that Plaintiff had "Musculoskeletal low-

---

[4] Dr. Reddy's other diagnoses and prescriptions are illegible. TR 402.

back pain in association with basically a benign back x-ray and no evidence of paraspinous muscle spasm or nerve root compression." TR 334. He found that Plaintiff had anxiety and "cancer of the kidney that sounds like it has been all removed." *Id.* Dr. Thurman also stated, "He is still somewhat stiff in his back as a result of this major surgery." *Id.* Finally, Plaintiff was found to have "no impairment-related physical limitations." TR 335.

On May 28, 2001, a DDS physician completed a Residual Functional Capacity Assessment ("RFC") (Physical) regarding Plaintif. TR 337-346.[5] Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit for a total of around 6 hours in an 8-hour workday, and had an unlimited ability to push and/or pull "including operation of hand and/or foot controls." TR 338. The DDS physician found that Plaintiff had occasional postural limitations when climbing, balancing, stooping, kneeling, crouching and crawling. TR 339. Plaintiff had a limited ability to reach all directions but has unlimited ability in handling, fingering, and feeling. TR 340. The assessment also showed that Plaintiff had no visual, communicative or environmental limitations. TR 340-341. A physician's notes indicate that significant medical improvement did not occur because Plaintiff still had lower back pain. TR 346.

On June 15, 2001, a DDS physician completed an RFC (mental) regarding Plaintiff. TR 347-352. The DDS physician found that Plaintiff was moderately limited in his ability to "understand and remember detailed instructions," "carry out detailed instructions," and "maintain attention and concentration for extended periods." TR 347. Plaintiff was found to be moderately limited in his ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without

---

[5]TR 345 is missing from the record; instead, there are two copies of TR 346.

9

an unreasonable number and length of rest periods," "to accept instructions and response appropriately to criticism from supervisors," "to respond appropriately to changes in the work setting," and "to set realistic goals or make plans independently of others." TR 348. Plaintiff also had marked limitations in his "ability to interact appropriately with the general public." *Id.* In all other areas of understanding and memory, sustained concentration and persistence, social interaction, and adaption, Plaintiff was not significantly limited. TR 347-348.

Also on June 15, 2001, a DDS physician completed a Psychiatric Review Technique Form regarding Plaintiff.[6] TR 353-366. Plaintiff was found to have "Affective Disorders," "Anxiety-Related Disorders," and "Personality Disorders." TR 353. Plaintiff experienced mild "Restriction of Activities of Daily Living," moderate "Difficulties in Maintaining Social Functioning," and "Difficulties in Maintaining Concentration, Persistence, or Pace," and no "Repeated Episodes of Decompensation, Each of Extended Duration." TR 363.

On July 30, 2001, Plaintiff was treated by Dr. Reddy for a backache.[7] TR 401. Dr. Reddy continued Plaintiff's current medications while adding Lortab. *Id.* One month later, on August 31, 2001, Plaintiff had a follow-up appointment with Dr. Reddy for his backache. TR 400. Plaintiff commented that the pain was better with the medicine and Dr. Reddy continued Plaintiff on his medications. *Id.*

On September 5, 2001, Dr. Reeta Misra completed another physical RFC for Plaintiff. TR 367-376. Dr. Misra found that plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk for about 6 hours in an 8-hour workday,

_____

[6] The physician's signature is illegible. TR 353.

[7] Dr. Reddy's other diagnoses are illegible. TR 401.

10

sit for about 6 hours in an 8-hour work day, and had unlimited abilities to push and/or pull.  TR

368.  Plaintiff had frequent limitations in climbing, balancing, stooping, kneeling, crouching, and

crawling.  TR 369. However, Plaintiff had no manipulative, visual, communicative, or

environmental limitations. TR 370-371.

On September 12, 2001, Dr. Victor A. Pestrak completed a Psychiatric Review

Technique Form regarding Plaintiff.  TR 377-392.  Plaintiff was diagnosed with a "Depressive

Disorder, NOS" and a Personality disorder marked by "dependant traits."  TR 380, 384.   Dr.

Pestrak found that Plaintiff had mild restriction of activities of daily living and difficulties in

maintaining social functioning.  TR 387.  Plaintiff had moderate limitations in maintaining

concentration, persistence or pace with no "Repeated Episodes of Decompensation."  *Id.*  Dr.

Pestrak found that significant medical improvement did occur. TR 392.  Additionally, Dr.

Pestrak completed a mental RFC regarding Plaintiff. TR 393-395.  He found that Plaintiff was

moderately limited in the following areas: "the ability to carry out detailed instructions," "the

ability to maintain attention and concentration for extended periods," and "the ability to work in

coordination with or proximity to others without being distracted by them."  TR 393. Plaintiff

was also found to be moderately limited in "the ability to complete a normal workday and

workweek without interruptions from psychologically based symptoms and to perform at a

consistent pace without an unreasonable number and length of rest periods," "the ability to

interact appropriately with the general public," and "the ability to respond appropriately to

changes in the work setting." TR 394.  In all other areas of understanding and memory, sustained

concentration and persistence, social interaction and adaption, Plaintiff was found to be not

significantly limited. TR 393-394.

On September 28, 2001, Dr. Reddy treated Plaintiff at Baptist Hospital for a "backache

radiating down [his] legs." TR 399. Dr. Reddy conducted an "MRI of the lumbar spine with

and without contrast," finding that there were "mild degenerative disc changes at the L4-5 level

without evidence of spinal stenosis." *Id.* Dr. Reddy saw Plaintiff again on October 1, 2001 for

back pain. TR 398. Dr. Reddy prescribed two additional medications.[8] *Id.* On November 1,

2001, Plaintiff was treated by Dr. Reddy for back pain which Plaintiff noted was relieved by pain

medication. TR 397. Dr. Reddy additionally prescribed "Depakote." *Id.*

From November 26, 2001 to October 3, 2002, Plaintiff was evaluated monthly by a

physician at the Primary Care and Pain Relief Center. TR 421-428, 431-434.[9] The diagnosis for

Plaintiff throughout those evaluations was lower back pain, to be treated with Lortab. TR 421-

435. On February 22, 2002, the physician also noted a diagnosis of "myofascitis." TR 425. The

physician noted on both March 22, 2002 and May 22, 2002 that Plaintiff's pain increased with

prolonged activity and decreased while sitting. TR 422, 424.

Plaintiff underwent a Psychiatric Evaluation on February 13, 2002 at Lutton Mental

Health Services. TR 415-419. A doctor diagnosed Plaintiff with Depressive disorder "NOS"

and, it appears, "Etoh abuse" in full remission. TR 419. Plaintiff was found to have "problems

with primary support group," "problems related to social environment," "economic problems,"

and "other psychosocial and environmental problems." *Id.* His then-current GAF was a 55, and

he was treated with Risperdal. *Id.*

Plaintiff was evaluated and treated by Centerstone Community Mental Health Centers on

numerous occasions from February 13, 2002 to May 30, 2002. TR 403-419. On one occasion,

_____

[8] The names of the additional medications are illegible. TR 398.

[9] Many of the medical records for these evaluations are illegible.

Plaintiff reported that he was "upset about mom" because she only has a "few months to live." TR 404. On another occasion, Plaintiff telephoned, reporting that he had gone to the emergency room over the weekend saying he "was going to blow his brains out." TR 406, 407. On yet another occasion, Plaintiff telephoned, complaining that his medication was "not doing any good." TR 408. Upon examination, he was found to have a "bad attitude," decreased motivation, and anxiety (TR 410-411), and was characterized as having "Mild depressive symptoms." TR 412. His long term goal was to "Comply with medication regimen."[10] *Id.* Plaintiff indicated that he "used to drink" and that "[he] did not think [he] had a problem," but the doctor did. TR 416.

On September 20, 2002, Plaintiff was treated for depression with suicide ideation and was given an aftercare plan by the Middle Tennessee Health Institute. TR 450-451. The discharge order included a 3-day supply of Ranitidine, Amitripllilin, Tylenol, Celexa, and Neurontin. TR 452. His anticipated post discharge problems were a "relapse of illness," non-compliance with medication, "get[ting] back to alcohol,"and "lack of follow-up." *Id.* The recommended solutions for these discharge problems were "medication education," a follow-up appointment, and a case manager. *Id.* Both the Mental and Physical Medical Source Statement of Ability To Do Work-Related Activities were returned incomplete. TR 456-461.

On October 2, 2002, Plaintiff was evaluated at Primary Care and Pain Relief Center.[11] TR 445. Plaintiff was diagnosed with lower back pain, "myofascitis," and anxiety. *Id.* On October 31, 2002, Plaintiff's prescriptions for Valium and Lortab were refilled and he was given

---

[10] A summary of Plaintiff's prescription medicine from December 13, 2001 to May 30, 2002 can be found at TR 414.

[11] The name of Plaintiff's doctor is illegible. TR 445.

13

additional medication.[12]  TR 444.  Again on December 3, 2002, Plaintiff was re-evaluated and given the same diagnosis. TR 443.  In addition to a refill of his then-current prescriptions, Plaintiff was also given a prescription for Percodan.  *Id.*  On January 6, 2003, Plaintiff was treated for lower back pain, anxiety, and "myofascitis" with the same treatment plan. TR 441.  Plaintiff was given an additional diagnosis for depression on February 5, 2003 by the Primary Care and Pain Relief Center.  TR 440.

The record contains what appears to be Plaintiff's handwritten descriptions of his ailments.[13]  TR 435-438.  These descriptions include the following statements: "[i]t takes me about 3hr. to get ready to go the Dr. Store [*sic*] or anywhere"; "I spend a lot of time crying"; and "[w]hen I get scared or nervise [*sic*] I pull my toe nails out!" TR 435-437.

On April 16, 2003, a Medical Assessment of Ability to do Work-Related Activities regarding Plaintiff was completed by Mary Ellan at the Luton Mental Health Services.  TR 462-464.  Plaintiff's back pain was not found to affect his ability to understand, remember and carry out instructions.  TR 463.  Plaintiff was found to have only slight limitations in his ability to "understand and remember short, simple instructions," "carry out short, simple instructions," "understand and remember detailed instructions," "carry out detailed instructions," and "make judgments on simple work-related decisions."  *Id.*  The back pain was also found to not impair his ability to "respond appropriately to supervision, co-workers, and work pressures." TR 464.  He was found to have a moderate limitation in interacting appropriately with supervisor[s], responding "appropriately to work pressures in a usual work setting," and responding

---

[12] The names of the additional medications are illegible.  TR 444.

[13] The first page of these handwritten notes is dated October 9, 2002; however, no dates appear on any of the other pages.

14

"appropriately to changes in a routine work setting." *Id.* The physician also noted that Plaintiff

"appears to be dependent upon his pain medication." *Id.*

## B. Plaintiff's Testimony

Plaintiff was born on February 3, 1953, and has an 8th grade education. TR 526. Plaintiff

testified that he lives in an apartment with his mother, who is dying of cancer. TR 527. When

asked about his drinking and smoking habits, Plaintiff explained that he does not drink but he

smokes "about a half a pack" of cigarettes per day. TR 530. Plaintiff explained that he had

worked since 1993, stating that "two years before I got on disability, I hadn't worked." *Id.*

When asked about the major problem that prevents Plaintiff from working, he testified:

> My lower back, all the way down to my feet, and the tops of my
> thighs are numb, and they hurt all the time. My back is continually
> hurting all the time, and I have to either get up, sit down, or lay
> down because it's a 24-hour thing with me; it doesn't just happen
> in the daytime.

TR 531. Plaintiff explained that he believes the cause of this pain were the "six, total, car

wrecks" in which he had been involved. *Id.* Plaintiff also testified to "arthritis in [his]

shoulders" and something in his chest from when he "cut a telephone pole down with the car."

TR 531-532.

In addition, Plaintiff explained that he has a "hiatal hernia" and chest pain. TR 532. He

stated: "I get [chest pain] once or twice – sometimes as many as three times a year, I can't hardly

breath [*sic*]." *Id.* When asked if there is anything else that prevents him from working, Plaintiff

testified: "I haven't brought this up to anybody. I'm ashamed of it. But . . . I lost my right kidney

to cancer last year, . . . sometimes, when I go to the restroom, it doesn't want to stop."[14] *Id.*

---

[14] The ALJ refused to consider this ailment because there was no diagnosis or treatment in
Plaintiff's file. TR 533.

Plaintiff also complained that he "can't concentrate" on what he is doing. TR 533. Plaintiff does not drive a car because of "dizzy spells," but there are no treatment records regarding this condition. TR 533-534.

Plaintiff testified that he suffers from depression, stating the reason as "[w]hat's inside, so just thinking about the way I've lived my life and not done that and what I should have. I drank way too long." TR 534. However, Plaintiff has not "touched a drop" of alcohol in about 12 or 13 years since his panic attack that put him in the hospital for 9 days and nights. TR 535. Plaintiff testified that his depressed states are "all the time" and that "it's very seldom [he] get [*sic*] anything that makes [him] happy." *Id.* He also suffers from anxiety attacks "all the time" and "can get them at the store if it's a long line." *Id.* Plaintiff explained that his "back room" is where "I'm safe at." *Id.* When he comes out of his back room, Plaintiff stated: "I got a wall around me. It's like I got one right now. You all ain't going to – not going to hurt me." *Id.* When Plaintiff is around other people he is "scared to death." TR 536. Plaintiff's depression anxiety has been present for about 15 years and he also suffers from claustrophobia. *Id.* Plaintiff explained that he is seen by a pscyhiatrist once a month and that he takes one Prozac every day. *Id.* Plaintiff testified, however, that he has not noticed that his medication helps his depression and anxiety. TR 537. Plaintiff stated that his depression prevents him from sleeping, that he has "fitful sleeps [*sic*]" and that in his sleep he has "pieces knocked off the walls, kicked off the walls." TR 538.

In addition to depression and anxiety, Plaintiff testified that he suffers from hallucinations. TR 536. Plaintiff explained the nature of these hallucinations:

> I'll be sitting there, talking with somebody and not looking at them, but when I look up – I want to ask them a question. I'll look up; they just kind of get up and fade away, walking away from me.

16

TR 537. His last hallucination was the night before the hearing. *Id.*

When asked if he has ever thought of suicide, Plaintiff testified: "Yeah, last month I put a 12-gauge shotgun on my head and pulled the hammer back." TR 538. The police, however, "came by and took [his] gun away" and Plaintiff stayed for four days at "Censor State [phonetic]." *Id.* Plaintiff was asked about the last time he contemplated suicide, to which he responded: "[l]ike five minutes ago. It's just constantly on my mind." TR 539. Plaintiff testified that he "cannot count all the times [he's] attempted to commit suicide" and has been suicidal since the death of his grandmother. TR 539-540.

Plaintiff described his lower back pain: "It's like if you take two knives and stick them in there and just twist them, and . . . it just goes down my legs, right down through the bottom of my feet." TR 540. To deal with this pain, Plaintiff stated that he sits in a chair, gets up and walks around. *Id.* In addition, Plaintiff stated that he has pain medication prescribed to him by Dr. Reiner and that "he give [*sic*] me four shots and – two shots in each side of my back." TR 541.

Plaintiff testified that his last job was at the steam plant in Mid-Cumberland, Tennessee. TR 541. He drove a "yuke" (TR 541) which was "one of the world's largest dump trucks" (TR 547).

### C. Vocational Testimony

Vocational Expert ("VE"), Gordon Doss, also testified at Plaintiff's hearing. TR 545. Dr. Doss classified Plaintiff's work as a "yuke" driver as "medium and unskilled." TR 548. Dr. Doss testified that Plaintiff's other previous job was a "groundkeeper at a golf course, which is medium and unskilled; based on the information provided in the file as he performed it, it was heavy and unskilled." *Id.* He found no other references to Plaintiff's job experience. *Id.*

17

The ALJ presented the VE with a hypothetical situation paralleling that of Plaintiff and asked if the hypothetical claimant would be able to do any of the work that Plaintiff had done in the past. TR 548-554. The VE answered that the hypothetical claimant could not work as a dump truck driver because the required lifting of the hood for maintenance of the truck would be medium and not light work. TR 550.

The VE opined that in the State of Tennessee, there are approximately 3,898 positions as a domestic housekeeper at the light level, 3,800 positions as a companion or sitter for a bed-bound person in an hospital or nursing home, and 4,644 positions as a presser for a laundry or garment manufacturer, all of which would be appropriate for the hypothetical claimant. TR 552-553. In addition, the VE testified that there are numerous other positions which would be appropriate for Plaintiff, including 3,800 positions as a cleaner for a cleaning service which is an unskilled, light job. TR 552. Dr. Doss clarified that this list is not exhaustive but only representative of the type of jobs a person with Plaintiff's limitations could perform. TR 553.

Dr. Doss also testified that there are many people with anxiety and panic attacks that working in labor as long as the symptoms cause only a "mild or moderate decrease in ability to concentrate . . . ." TR 554. Dr. Doss stated, however, that if the symptoms rise "to the moderate or severe level on a persistent basis and effect [*sic*] psychological functioning, . . . then, by definition, no work would be available. *Id.* In the original hypothetical the back pain was moderate, but if the back pain were moderately severe to severe, Dr. Doss testified that it would "interfere with concentration and regular attendance at work and prevent him from full-time work." *Id.* With regard to hallucinations, Dr. Doss again stated that it "depends on the degree to which it affects a person's ability to psychological functioning [*sic*]." TR 555.

18

## III.  CONCLUSIONS OF LAW

### A.  Standard of Review

This Court's review of the Commissioner's decision is limited to the record made in the administrative hearing process.  *Jones v. Secretary*, 945 F.2d 1365, 1369 (6th Cir. 1991).  The purpose of this review is to determine (1) whether substantial evidence exists in the record to support the Commissioner's decision, and (2) whether any legal errors were committed in the process of reaching that decision.  *Landsaw v. Secretary*, 803 F.2d 211, 213 (6th Cir. 1986).

"Substantial evidence" means "such relevant evidence as a reasonable mind would accept as adequate to support the conclusion."  *Her v. Commissioner*, 203 F.3d 388, 389 (6th Cir. 1999) (*citing Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "Substantial evidence" has been further quantified as "more than a mere scintilla of evidence, but less than a preponderance."  *Bell v. Commissioner,* 105 F.3d 244, 245 (6th Cir. 1996) (*citing Consolidated Edison Co. v. N.L.R.B.,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

The reviewing court does not substitute its findings of fact for those of the Commissioner if substantial evidence supports the Commissioner's findings and inferences.  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  In fact, even if the evidence could also support a different conclusion, the decision of the Administrative Law Judge must stand if substantial evidence supports the conclusion reached.  *Her*, 203 F.3d at 389 (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  However, if the Commissioner did not consider the record as a whole, the Commissioner's conclusion is undermined.  *Hurst v. Secretary*, 753 F.2d 517, 519 (6th Cir. 1985) (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980) (*citing Futernick v. Richardson,* 484 F.2d 647 (6th Cir. 1973))).

In reviewing the decisions of the Commissioner, courts look to four types of evidence:

19

(1) objective medical findings regarding Plaintiff's condition; (2) diagnosis and opinions of medical experts; (3) subjective evidence of Plaintiff's condition; and (4) Plaintiff's age, education, and work experience.  *Miracle v. Celebrezze*, 351 F.2d 361, 374 (6th Cir. 1965).

## B.  Proceedings At The Administrative Level

The claimant carries the ultimate burden to establish an entitlement to benefits by proving his or her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "Substantial gainful activity" not only includes previous work performed by Plaintiff, but also, considering Plaintiff's age, education, and work experience, any other relevant work that exists in the national economy in significant numbers regardless of whether such work exists in the immediate area in which Plaintiff lives, or whether a specific job vacancy exists, or whether Plaintiff would be hired if he or she applied.  42 U.S.C. § 423(d)(2)(A).

At the administrative level of review, the claimant's case is considered under a five-step sequential evaluation process as follows:

(1)  If the claimant is working and the work constitutes substantial gainful activity, benefits are automatically denied.

(2)  If the claimant is not found to have an impairment which significantly limits his or her ability to work (a "severe" impairment), then he or she is not disabled.

(3)  If the claimant is not working and has a severe impairment, it must be determined whether he or she suffers from one of the "listed" impairments[15] or its equivalent.  If a listing is met or equaled, benefits are owing without further inquiry.

---

[15] The Listing of Impairments is found at 20 C.F.R., Pt. 404, Subpt. P, App. 1.

20

(4)  If the claimant does not suffer from any listing-level impairments, it must be determined whether the claimant can return to the job he or she previously held in light of his or her residual functional capacity (e.g., what the claimant can still do despite his or her limitations).  By showing a medical condition that prevents him or her from returning to such past relevant work, the claimant establishes a *prima facie* case of disability.

(5)  Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner to establish the claimant's ability to work by proving the existence of a significant number of jobs in the national economy which the claimant could perform, given his or her age, experience, education, and residual functional capacity.

20 C.F.R. § 416.920 (footnote added).  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

The Commissioner's burden at the fifth step of the evaluation process can be satisfied by relying on the medical-vocational guidelines, otherwise known as "the grid," but only if the claimant is not significantly limited by a nonexertional impairment, and then only when the claimant's characteristics identically match the characteristics of the applicable grid rule. Otherwise, the grid cannot be used to direct a conclusion, but only as a guide to the disability determination.  *Id.*  In such cases where the grid does not direct a conclusion as to the claimant's disability, the Commissioner must rebut the claimant's *prima facie* case by coming forward with particularized proof of the claimant's individual vocational qualifications to perform specific jobs, which is typically obtained through vocational expert testimony.  *See Varley v. Secretary*, 820 F.2d 777, 779 (6th Cir. 1987).

In determining residual functional capacity for purposes of the analysis required at stages four and five above, the Commissioner is required to consider the combined effect of all the claimant's impairments; mental and physical, exertional and nonexertional, severe and

nonsevere.  *See* 42 U.S.C. § 423(d)(2)(B).

### C.  Plaintiff's Statement Of Errors

Plaintiff contends that the ALJ erred in 1) finding that Plaintiff's allegations of pain and disability were not credible; 2) misinterpreting Plaintiff's medical source statement from a treating source for his mental health conditions, 3) failing to give proper consideration to the opinion of the most recent pyschological consultative examiner; and 4) finding that Plaintiff was capable of performing a significant number of other jobs.  Plaintiff also contends that the Appeals Council erred in failing to properly consider new and material evidence.  Docket Entry No. 18-2.  Accordingly, Plaintiff maintains that, pursuant to 42 U.S.C. § 405(g), the Commissioner's decision should be reversed, or in the alternative, remanded.  *Id.*

> Sentence four of § 405(g) states as follows:
>
> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.

42 U.S.C. § 405(g).

"In cases where there is an adequate record, the Secretary's decision denying benefits can be reversed and benefits awarded if the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking."  *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).  Furthermore, a court can reverse the decision and immediately award benefits if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits.  *Faucher v. Secretary*, 17 F.3d 171, 176 (6th Cir. 1994).  *See also Newkirk v. Shalala*, 25 F.3d 316, 318 (1994).

A court may also remand the decision on the basis of new and material evidence.

22

Sentence Six of §405(g) states as follows:

> The court may, on motion of the Commissioner of Social Security
> for further action by the Commissioner of Social Security, and it
> may at any time order additional evidence to be taken before the
> Commissioner of Social Security, but only upon a showing that
> there is new evidence which is material and there there is good
> cause for the failure to incorporate such evidence into the record in
> a prior proceeding; and the Commissioner of Social Security shall,
> after the case is remanded, and after hearing such additional
> evidence if so ordered, modify or affirm the Commissioner's
> findings of fact or the Commissioner's decision, or both, and shall
> file with the court any such additional and modified findings of
> fact and decision, and a transcript of the additional record and
> testimony upon which the Commissioner's action in modifying or
> affirming was based.

42 U.S.C. § 405(g).

## 1. Subjective Complaints of Pain

Plaintiff contends that in finding that his subjective complaints were not fully credible,

the ALJ did not appropriately address his complaints of pain. Docket Entry No. 18-2.

Specifically, Plaintiff argues that the ALJ "scoured the record to find a few isolated incidents in

order to find the claimant not credible in this regard." *Id.* Plaintiff asserts that "these incidents

do not discount the overwhelming substantial evidence of plaintiff's ongoing pain" and that

"[s]poradic activity by a claimant does not mean a claimant has the ability to work." *Id.* Finally,

Plaintiff upholds that his pain continues to be "severe and persistent." *Id.*

The Sixth Circuit has set forth the following criteria for assessing a plaintiff's allegations

of pain:

> [S]ubjective allegations of disabling symptoms, including pain,
> cannot alone support a finding of disability...[T]here must be
> evidence of an underlying medical condition *and* (1) there must be
> objective medical evidence to confirm the severity of the alleged
> pain arising from the condition *or* (2) the objectively determined
> medical condition must be of a severity which can reasonably be

23

expected to give rise to the alleged pain.

*Duncan v. Secretary*, 801 F.2d 847, 853 (6th Cir. 1986) (*quoting* S. Rep. No. 466, 98th Cong., 2d Sess. 24) (Emphasis added); *see also* 20 C.F.R. §§ 404.1529, 416.929 ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled...."); and *Moon v. Sullivan*, 923 F.2d 1175, 1182-83 ("[T]hough Moon alleges fully disabling and debilitating symptomology, the ALJ, may distrust a claimant's allegations...if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."). Moreover, "allegations of pain...do not constitute a disability unless the pain is of such a debilitating degree that it prevents an individual from engaging in substantial gainful activity." *Bradley v. Secretary*, 862 F.2d 1224, 1227 (6th Cir. 1988).

When analyzing the claimant's subjective complaints of pain, the ALJ must also consider the following factors and how they relate to the medical and other evidence in the record: the claimant's daily activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain. *See Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994) (*construing* 20 C.F.R. § 404.1529(c)(2)). After evaluating these factors in conjunction with the evidence in the record, and by making personal observations of the claimant at the hearing, an ALJ may determine that a claimant's subjective complaints of pain and other disabling symptoms are not credible. *See, e.g., Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Blacha v. Secretary*, 927 F.2d 228, 230 (6th Cir. 1990); and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981).

In the instant case, the ALJ found that Plaintiff's allegations of pain after June 2001 were not credible. TR 24. Specifically, the ALJ articulated that the allegations of pain "are not

24

reasonably supported by the objective medical evidence and are "inconsistent with the range of daily activities indicated by the weight of the evidence." TR 21. The ALJ noted the lack of objective evidence to support Plaintiff's need for a wheelchair or cane; that neither Plaintiff's back pain nor his vision approached the severity required by Appendix One; that Plaintiff did not have severe impairment of intellectual functioning, that Plaintiff had "no post-surgical soreness or any significant residuals of the kidney surgery . . . for more than 12 months after the July 2000 surgery"; and that Plaintiff had engaged in daily activities like household chores, driving a motorized cart and working on a car. TR 21-22. As can be seen, the ALJ's decision specifically addresses in great detail not only the medical evidence, but also Plaintiff's testimony and his subjective claims, clearly indicating that these factors were considered. TR 20-23.

The ALJ's decision properly discusses Plaintiff's "activities; the location, duration, frequency and intensity of claimant's pain; the precipitating and aggravating factors; the type, dosage and effect of medication; and the other treatment or measures to relieve pain." *Felisky*, 35 F.3d at 1039 (*construing* 20 C.F.R. § 404.1529(c)(2)). Specifically, the ALJ noted that Plaintiff had been prescribed Prozac for anxiety and depression, had received monthly pain control injections in his back, and had intermittent prescriptions for Hydrocodone, Lortab, Amitriptyline, and Valium for pain, anxiety and depression. TR 20. The ALJ further remarked that "as recently as September 9, 2002 [approximately 13 months before the hearing] he was not taking any prescription or over-the-counter medications for symptom control." *Id.* The ALJ also noted that Plaintiff's treatment records from September 23, 2002 indicated that Plaintiff had been non-complaint with his medications. *Id.* It is clear from the ALJ's detailed articulated rationale that, although there is evidence which could support Plaintiff's claims, the ALJ chose to rely on medical findings that were inconsistent with Plaintiff's allegations. This is within the

25

ALJ's province.

The ALJ, when evaluating the entirety of the evidence, is entitled to weigh the objective medical evidence against Plaintiff's subjective claims of pain and reach a credibility determination. *See, e.g., Walters,* 127 F.3d at 531; and *Kirk v. Secretary,* 667 F.2d 524, 538 (6th Cir. 1981). An ALJ's findings regarding a claimant's credibility are to be accorded great weight and deference, particularly because the ALJ is charged with the duty of observing the claimant's demeanor and credibility. *Walters,* 127 F.3d at 531 (*citing Villarreal v. Secretary,* 818 F.2d 461, 463 (6th Cir. 1987)). Discounting credibility is appropriate when the ALJ finds contradictions among the medical reports, the claimant's testimony, the claimant's daily activities, and other evidence. *See Walters*, 127 F.3d at 531 (*citing Bradley,* 682 F.2d at 1227; *cf King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984); and *Siterlet v. Secretary*, 823 F.2d 918, 921 (6th Cir. 1987)). If the ALJ rejects a claimant's testimony as not credible, however, the ALJ must clearly state the reasons for discounting a claimant's testimony (*see Felisky*, 35 F.3d at 1036), and the reasons must be supported by the record (*see King*, 742 F.2d at 975). After assessing all the objective medical evidence, the ALJ determined that Plaintiff's subjective complaints of disabling pain and functional limitations are not fully credible. TR 24. As has been noted, this determination is within the ALJ's province.

The ALJ observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision; the ALJ's findings are supported by substantial evidence and the decision not to accord full credibility to Plaintiff's allegations was proper. Therefore, this claim fails.

## 2. Misinterpretation of a Medical Source Statement

Plaintiff maintains that the ALJ misinterpreted Plaintiff's April 2003 medical source

26

statement from a treating source for his mental health conditions. Docket Entry No. 18-2. Specifically, Plaintiff argues that the FNP who completed the April 2003 medical source statement indicated that Plaintiff was "*relatively* stable psychiatrical [*sic*]" (TR 463-464), but that the ALJ "mistakenly asserts in his opinion" that the FNP reported that Plaintiff "has been stable psychiatrically" (TR 22). (Emphasis added.) Plaintiff maintains that "this ommission was critical given the fact that 'relative' is a significant qualifier." Docket Entry No. 18-2, p. 14.

As an initial matter, the April 2003 medical source statement was completed by a Family Nurse Practitioner. TR 463-464. Although the ALJ can consider the evidence of a nurse practitioner, a nurse practitioner is considered an "other source" (20 C.F.R. § 404.1513(d)) and is not entitled to the same deference as an "acceptable medical source" (20 C.F.R. § 404.913(a)).

As has been noted, a Family Nurse Practitioner completed Plaintiff's April 2003 Medical Source Statement of Ability to do Work-Related Activities (Mental). TR 463-464. When asked, "Is ability to understand, remember, and carry out instructions affected by the impairment?", the FNP responded "No."[16] TR 463. The FNP found that Plaintiff was only slightly limited in his abilities to understand, remember, and carry out short simple instructions, to understand, remember and carry out detailed instructions, and to make judgments on simple work-related decisions. *Id.* The FNP also commented that Plaintiff's "main complaint is medical in nature - related to back pain. His is [*sic*] relatively stable psychiatrical [*sic*]." *Id.* The FNP further noted that Plaintiff had moderate limitations in his abilities to interact appropriately with supervisors, to respond appropriately to work pressures in a usual work setting, and to respond appropriately

---

[16] The form states that "If 'no,' go to question #2. If 'yes,' please check the appropriate block to describe the individual's restriction for the following work-related mental activities." TR 463. The nurse practitioner checked "no," however; she also checked the blocks the describe the individual's restrictions. *Id.*

to changes in a routine work setting.  TR 464.  The FNP noted that Plaintiff "does seem to have problems in public and his personal interactions do seem to be impaired" and that Plaintiff "appears to be dependent upon his pain medication." *Id.*

While Plaintiff is correct that the ALJ stated, "The most recent record from Luton, an April 16, 2003, assessment from one of its nurse practitioners, indicates that the claimant has been stable psychiatrically" (TR 22), this misstatement is harmless error, as the ALJ considered the record as a whole when finding that Plaintiff's mental health had improved.  Specifically, the ALJ considered the facts that Plaintiff had received infrequent mental health counseling; that, with one exception, Plaintiff's GAF had been assessed "in at least the range of 55-60"; that he had only "slight," "mild," and "moderate" limitations; that "there has been no history of mental decompensations since 2001"; and that he did not require a highly supportive living arrangement.  TR 22-23.  The ALJ further considered Plaintiff's claims of anxiety, depression, suicide, social withdrawal, disturbed dreams and visual hallucinations.  TR 20.  The ALJ noted, however,  that Plaintiff had been uncooperative with his examination schedule, had not taken prescription medications for symptom control, and had been non-compliant with his medications.  *Id.*  The ALJ's findings are supported by substantial evidence and his misstatement does not constitute reversible error.

### 3.  Opinion of Mr. Proffit, Consultative Examiner

Plaintiff contends that the ALJ's conclusion that Plaintiff had moderate difficulties in the abilities to carry out detailed instructions, maintain attention / concentration for extended periods, work with others without being distracted by them, complete a normal workday and workweek, maintain a consistent pace without psychologically based symptoms or unreasonable breaks, interact appropriately with the general public, and respond appropriately to changes in

28

the work setting (TR 22), conflicts with the opinion of consultative examiner, James Proffit (Docket Entry No 18-2, p. 16).

The ALJ considered the findings of consultative examiner James Proffitt in his opinion. TR 22. The ALJ noted Dr. Proffitt's assessment that Plaintiff had "borderline to low average" intellectual functioning, and he found Dr. Proffit's diagnosis of Plaintiff having panic disorder with agoraphobia, and dysthymia consistent with the treatment records. *Id.* The ALJ further noted that Dr. Proffit's finding Plaintiff's "sustained GAF over the previous year in the range of 55-65" was likewise consistent with the treatment records. *Id.* The ALJ additionally noted, "Non-examining SSA psychologists concurred with the treating source and examining consultant assessments of no more than moderate symptomology on June 15 and September 12, 2001." *Id.*

Although Plaintiff is correct in his assertion that the ALJ's ultimate conclusion differs from that of Dr. Proffit, the Regulations do not mandate that the ALJ give Dr. Proffit's opinion controlling weight. *See* 20 C.F.R. § 416.927(d). Dr. Proffitt was a consultative examiner, not a treating physician. *Id.* Moreover, while many of Dr. Proffitt's findings were consistent with other evidence of record, some were not. *Id.* When considering the record as a whole, the ALJ specifically discussed Dr. Proffitt's findings and how they related to other evidence of record. The ALJ ultimately disagreed with Dr. Proffitt's disability determination. That is within his province. The ALJ accorded Dr. Proffitt's opinion appropriate weight and the ALJ's decision was supported by substantial evidence. Therefore, this claim fails.

### 4. Existence of Significant Numbers of Jobs

Plaintiff contends that the ALJ erred in finding, under the grid rules, that there were a significant number of jobs in the national economy that Plaintiff could perform. Docket Entry No. 18-2. Specifically, Plaintiff argues that it was improper for the ALJ to rely on the grid rules

29

despite Plaintiff's nonexertional limitations.  *Id.*

As explained above, the Commissioner has the burden at step five of the sequential evaluation process of establishing the claimant's ability to work by proving the existence of a significant number of jobs in the national economy that the claimant could perform, given his or her age, experience, education, and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920.  *See also Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).  The Commissioner's burden at step five can be satisfied by relying on the grid rules only if Plaintiff is not significantly limited by nonexertional impairments, such as mental limitations, manipulative limitations or environmental limitations.  *Abbot v. Sullivan*, 905 F.2d 918, 926 (6th Cir. 1990).  In the presence of nonexertional limitations that would preclude the application of the grid regulations, "expert testimony would be required to satisfy the Secretary's burden of proof regarding the availability of jobs which this particular claimant can exertionally handle."  *Kirk v. Secretary*, 667 F.2d 524, 531 (6th Cir. 1983).  In other words, the ALJ may rely on the testimony of a vocational expert in response to a hypothetical question as substantial evidence of the existence of a significant number of jobs that the claimant is capable of performing as long as the hypothetical question accurately represents the claimant's limitations.  *See Varley*, 820 F.2d at 779 (*quoting O'Banner v. Secretary*, 587 F.2d 321, 323 (6th Cir. 1978)).

The ALJ's decision in the case at bar specifically addressed Plaintiff's nonexertional limitations. TR 22-23.  The ALJ noted, *inter alia*, that Plaintiff had received infrequent counseling for anxiety and depression and had had a sustained GAF of 55-60.  TR 22.  The ALJ further noted that on one occasion Plaintiff's GAF was 51, which indicates "moderate symptoms."  *Id.*  The ALJ also reported that Plaintiff had experienced "no more than moderate symptoms in interacting with supervisors and coping with work pressures and changes, with only

30

slight limitations in other areas of consideration." *Id.* The ALJ additionally noted that Plaintiff's IQ was in the "borderline to low average range." *Id.* The ALJ, however, found that there had been "no evidence of cognitive deficits of a degree to indicate a severe impairment of intellectual functioning." *Id.* Further, the ALJ considered, *inter alia*, Plaintiff's impairments in following instructions, concentration, social interactions, and changes in the work setting, but found that Plaintiff did not have mental impairments of a severity to meet Appendix One requirements. TR 22-23.

Moreover, the ALJ's hypothetical question posed to Vocational Expert Gordon Doss incorporated Plaintiff's nonexertional limitations, as well as Plaintiff's age, education, work experience, residual functional capacity for light work, and postural limitations. *See* TR 23. The ALJ recognized that Plaintiff's visual and mental limitations "preclude performance of the full range of light work" and asked the VE to identify jobs for "an individual with the claimant's residual functional capacity and vocational factors." *Id.* The ALJ's hypothetical question accurately represented Plaintiff's limitations, both exertional and nonexertional.

Plaintiff also argues that the jobs the vocational expert found were available only prior to several key hypothetical limitations posed by the ALJ. Docket Entry No. 18-2. Specifically, the ALJ posed hypothetical limitations on concentration, persistence and pace, anxiety/panic attacks, hallucinations, and more severe back pain. *Id.* These hypotheticals, however, were based on Plaintiff's subjective complaints.

As discussed above, the ALJ ultimately found that the claimant's "subjective allegations of a continuation of disabling pain and functional limitations since June 1, 2001, are not credible." TR 24. When the ALJ properly discounted the credibility of Plaintiff's subjective complaints, he was no longer bound to consider them in his hypotheticals. *See* Cline v. Shalala,

96 F.3d 146, 150 (6th Cir. 1996).

Because the ALJ's hypothetical question accurately represented Plaintiff's limitations that he found credible, the ALJ properly relied on the VE's answer to the hypothetical question to prove the existence of a significant number of jobs in the national economy that Plaintiff could perform. *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994); *Hardaway v. Secretary*, 823 F.2d 922, 927-928 (6th Cir. 1987); and *Varley*, 820 F.2d at 779. Accordingly, Plaintiff's claim fails.

### 5. New and Material Evidence

Plaintiff argues that the additional records from Primary Pain and Care Relief Center and Centerstone constitute new and material evidence, and that the Appeals Council must accept review of the ALJ's decision when new and material evidence is submitted. Docket Entry No. 18-2. Plaintiff maintains that remand pursuant to Sentence Six of 42 U.S.C. § 405(g) is warranted to consider the new evidence submitted to the Appeals Council. *Id.*

Plaintiff was evaluated at Primary Care and Pain Relief Centers from November 26, 2001 until December 29, 2003. TR 490-515. Plaintiff contends that the records from March 2003 to December 2003 contain new and material evidence. Docket Entry No. 18-2. Each of the appointments during that time period, however, reveal the same diagnosis: anxiety and depression. TR 490-501. The records from Centerstone indicate that Plaintiff contemplated suicide in March 2003, July 2003, September 2003 and November 2003. TR 468, 470, 472, 474. On Plaintiff's Mental Progress Note from February 18, 2004, the day of the hearing, however, the evaluating doctor said that Plaintiff reported no suicidal ideation. TR 476.

The regulations provide that where new and material evidence is submitted with the request for review, the entire record will be evaluated and review granted where the Appeals

Council finds that the ALJ's actions, findings, or conclusions are contrary to the weight of the evidence. 20 C.F.R. § 416.1470. After reviewing additional evidence and the record as a whole, the Appeals Council determined that there was no basis under the regulations for granting Plaintiff's review. TR 10-11. The Appeals Council explicitly stated that "[a]lthough not considered by the Administrative Law Judge, this additional evidence does not establish a further deterioration in your ability to engage in work related activities or to function in a work setting. We found that this information does not provide a basis for changing the Administrative Law Judge's decision." *Id.*

Remand for consideration of new and material evidence is appropriate only when the claimant shows that: (1) new material evidence is available; *and* (2) there is good cause for the failure to incorporate such evidence into the prior proceeding. *Willis v. Secretary*, 727 F.2d 551, 554 (6th Cir. 1984). Plaintiff can show neither.

As an initial matter, Plaintiff cannot establish that the additional records from the Primary Pain and Care Relief Center and Centerstone are material. "In order for the claimant to satisfy his burden of proof as to materiality, he must demonstrate that there was a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore v. Secretary*, 865 F.2d 709, 711 (6th Cir. 1988) (*citing Carroll v. Califano*, 619 F.2d 1157, 1162 (6th Cir. 1980)). Plaintiff has failed to satisfy this burden. Given that the additional evidence is consistent with past medical records and was reviewed by the Appeals Council, Plaintiff has failed to demonstrate that there is a reasonable probability that the Secretary would reach a different decision if given this evidence.

Even if the records from Primary Pain and Care Relief Center and Centerstone had been part of the record before the ALJ, "substantial evidence" supports the ALJ's findings and

33

inferences.  The ALJ's decision demonstrates that he carefully considered the testimony of both Plaintiff and Vocational Expert Gordon Doss, observed Plaintiff during his hearing, assessed the medical records, and reached a reasoned decision.  Additionally, the Appeals Council reviewed the records from Primary Pain and Care Relief Center and Centerstone, as well as the record as a whole, and expressly determined that the information contained in the additional records did not warrant changing the ALJ's decision.  TR 10.  Thus, there is no "reasonable probability that the Secretary would have reached a different disposition of the disability claim" if the additional records from Primary Care and Pain Relief Center and Centerstone had been part of the record before the ALJ.

Moreover, Plaintiff has not established "good cause" for failing to submit evidence of the psychological consultative exam scheduled in September 2003  to the ALJ during the hearing. Plaintiff argues that his physical and mental consultative exams "had been rescheduled several times because his mother was dying of cancer" and because of a "mix up in the time for the appointment" that was not the fault of Plaintiff.  Docket Entry No. 18-2.  This argument is unconvincing.  The appointment was rescheduled not just one time, but numerous times. Margaret Rediker, a disability examiner, noted: "These appts [*sic*] have been rescheduled numerous times...He keeps calling and moving it up...These doctors will not reschedule again." TR 193.  Plaintiff had ample opportunities to receive these mental and psychological exams beginning in July 2003.  TR 188-195.  Plaintiff has not shown good cause for failing to submit this evidence before the ALJ's decision in February 2004.

Plaintiff has failed to demonstrate either that this medical evidence was material or that there was good cause for his failure to present it at the administrative hearing.  Accordingly, remand pursuant to Sentence Six of 42 U.S.C. § 405(g) is not warranted.

34

# IV.  RECOMMENDATION

For the reasons discussed above, the undersigned recommends that Plaintiff's Motion for Judgment on the Administrative Record be DENIED, and that the decision of the Commissioner be AFFIRMED.

Under Rule 72(b) of the Federal Rules of Civil Procedure, any party has ten (10) days from receipt of this Report and Recommendation in which to file any written objections to it with the District Court.  Any party opposing said objections shall have ten (10) days from receipt of any objections filed in which to file any responses to said objections.  Failure to file specific objections within ten (10) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.  *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L. Ed. 2d 435 (1985), *reh'g denied,* 474 U.S. 1111 (1986).

_____
E. CLIFTON KNOWLES
United States Magistrate Judge

35